**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

**JAMES SA**,

          Plaintiff,

                                    No. 2:13-cv-10294

vs.                                Hon. Gerald E. Rosen

**RED FROG EVENTS, LLC**,
an Illinois corporation,

          Defendant.

_____/

**OPINION AND ORDER PARTIALLY GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

      This action arises out of an unfortunate and tragic accident during a running race organized by Defendant Red Frog Events, resulting in Plaintiff James Sa's paralysis from his chest down.  On January 23, 2013, Plaintiff filed a three-count Complaint, asserting negligence, gross negligence, and willful and wanton misconduct.[1]  Defendant has now moved to dismiss Plaintiff's Complaint on the grounds that Plaintiff waived his negligence claim and that his two other claims

---

[1] Michigan courts use "willful" and "wilful" interchangeably.  For consistency, this Court uses the former, unless in the context of a direct quote.

fail to state a claim upon which relief may be granted.[2]   Having reviewed and considered the parties' briefs and supporting documents and the entire record of this matter, the Court has determined that the pertinent allegations and legal arguments are sufficiently addressed in these materials and that oral argument would not assist in the resolution of these motions.   Accordingly, the Court will decide Defendant's motion "on the briefs."  See L.R. 7.1(f)(2).  This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

In July 2011, Plaintiff participated in a two-day event known as the "Warrior Dash" in Mt. Morris, Michigan.  (Plf's Compl., Dkt. # 1, at ¶¶ 5, 8).  The Warrior Dash is a 5k running race with obstacles, including jumping over fire, wall climbing, and a mud pit.  (*Id.* at ¶ 7).  Plaintiff was injured as a result of diving head first into the mud pit.  (*Id.* at ¶¶ 21-22).

Positioned directly across from bleachers and right before the finish line, the mud pit was the last obstacle of the race.  (*Id.* at ¶¶ 13-14).  One of Defendant's employees or agents was stationed near the mud pit with a microphone and loudspeaker, acting as an emcee for the event.  (*Id.* at ¶ 15).  Over the course of the event, this individual continually enticed, encouraged, and specifically told

---

[2] Though captioned as a "Motion for Summary Judgment," Defendant's Motion makes clear that it seeks dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), or alternatively, pursuant to Rule 56.  As discussed in more detail in footnotes 3 and 4, this Court applies Rule 12(b)(6) to this Motion.

participants to dive into the mud pit.  (*Id.* at ¶¶ 16, 26, 27).  It was common knowledge among participants that diving into the mud pit was not only permitted, but encouraged.  (*Id.* at ¶ 17).  As an example of this "common knowledge," bloggers commented about mud diving online.  (*Id.* at ¶ 18).  One noted the following:

> When I arrived at the Warrior Dash on Saturday morning I found out rather quickly that "mud diving" was rather popular on the last obstacle before the finish line. . . .  A good mud dive at this point makes perfect sense since runners are tired from the grueling course yet rejuvenated as they see the last obstacle.  I'm sure the spectator attention also gives a little more motivation for participants to bring their best mud dive as well. . . . Hopefully this joy is worth the pain they may have endured to make this happen since my brother-in-law had to go to the hospital after attempting a cannon ball.

(*Id.*).  This same person also posted "sweet pictures of an assortment of some of the best mud dives" and requested that readers "vote" for their favorite.  (*Id.*).

Before Plaintiff's race wave began, he witnessed many participants dive into the mud pit, heard the emcee encourage others to dive into the mud pit, and never saw anyone tell participants not to dive into the mud pit.  (*Id.* at ¶¶ 19, 27).  Defendant also did not post any signs instructing individuals not to dive into the mud pit.  (*Id.* at ¶ 20).  Accordingly, Plaintiff followed the emcee's encouragement and the lead of other participants and dove into the mud pit, resulting in paralysis from the chest down.  (*Id.* at ¶ 22).

Prior to participating in the Warrior Dash, Plaintiff -- as well as all other participants -- signed a "Waiver and Release of Claims" (Waiver).  (*Id.* at ¶ 9). The Waiver provides, in no uncertain terms, that Plaintiff "agree[s] not to dive into or enter the mud pit head first."  (Ex. A. to Def's Br., Dkt. # 4-1, at ¶ 17).[3]  Other pertinent language includes:

1.    I understand that entering Warrior Dash is a hazardous activity.

2.    I understand that Warrior Dash presents extreme obstacles including, but not limited to: fire, mud pits with barbed wire, cargo climbs, junk cars, and steep hills.

\* \* \*

7.    I assume all risks associated with competing in Warrior Dash, including, but not limited to: falls, contact with other participants, negligent or wanton acts of other participants, completing all obstacles, any defects or conditions of premises, and the effects of weather including high heat and/or humidity, all such risks being known and appreciated by me.

\* \* \*

DISCLAIMER
I understand that Red Frog Events, LLC is committed to conducting its race and activities in a safe manner and holds the safety of participants in high regard.  I understand that Red Frog Events, LLC continually strives to reduce such risks and insists that all participants follow safety rules and instructions that are designed to protect the participants' safety.  I also understand, however, that participants . . . registering for the race, programs, and activities must recognize that

---

[3] Defendant attached a signed copy of the Waiver in support of its Motion.  This Court may consider this document without treating Defendant's Motion as one for summary judgment because it is referred to in Plaintiff's Complaint and is central to his claim.  *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997).

4

there is an inherent risk of injury when choosing to participate in recreational activities and programs.

\* \* \*

WAIVER & RELEASE OF ALL CLAIMS; ASSUMPTION OF RISK

I recognize and acknowledge that there are certain risks of physical injury to participants in Warrior Dash, and voluntarily assume the full risk of any and all injuries, damages, or loss, regardless of severity, that I . . . may sustain as a result of said participation. . . . I assume all risks and hazards incidental to such participation in Warrior Dash, and I hereby waive, release, absolve, indemnify, and agree to hold harmless . . . Red Frog Events, LLC . . . for any claim arising out of an injury to me . . . and from any and all claims, causes of action, obligations, lawsuits, charges, complaints, contracts, controversies, covenants, agreements, promises, damages, costs, expenses, responsibilities, of whatsoever kind, nature, or description, whether direct or indirect, in law or in equity, in contract or tort, or otherwise, whether known or unknown, arising out of or connected with my . . . participation in Warrior Dash.

(*Id.*)   In accepting these terms, Plaintiff checked that he had read and fully understood the Waiver and signed with his own free act and deed.  (*Id.*).

## III. DISCUSSION

### A.   Applicable Standards

### 1.   Rule 12(b)(6) Standard

In deciding a motion brought under Rule 12(b)(6), the Court must construe the complaint in the light most favorable to Plaintiffs and accept all well-pled factual allegations as true. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007).  To withstand a motion to dismiss, however, a

complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The factual allegations in the complaint, accepted as true, "must be enough to raise a right to relief above the speculative level," and must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for defendant's conduct." *16630 Southfield Limited P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013).

The Sixth Circuit has emphasized that the "combined effect of *Twombly* and *Iqbal* [is to] require [a] plaintiff to have a greater knowledge . . . of factual details in order to draft a 'plausible complaint.'" *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011) (citation omitted). Put another way, complaints must contain "plausible statements as to when, where, in what or by whom," *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 373 (6th Cir. 2011), in order to avoid merely pleading "unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

2.    **Application of Michigan law**

This Court applies Michigan law as enunciated by the Michigan Supreme Court because subject matter jurisdiction in the matter is premised solely on diversity jurisdiction. *See, e.g., Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 723 (6th Cir. 2007); *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995). "Where the Michigan Supreme Court has not addressed an issue, [courts] may look to opinions issued by the Michigan appellate courts and should follow their reasoning unless [they] are 'convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Tooling, Mfg. & Technologies Ass'n v. Hartford Fire Ins. Co.*, 693 F.3d 665, 670 (6th Cir. 2012) (quoting *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 517 (6th Cir. 2001)).

**B.    The Waiver bars Plaintiff's negligence claim (Count I)**

In Michigan, "the validity of a release turns on the intent of the parties. A release must be fairly and knowingly made to be valid. If the language of a release is clear and unambiguous, the intent of the parties is ascertained from the plain and ordinary meaning of the language." *Batshon v. Mar–Que Gen. Contractors, Inc.*, 463 Mich. 646, 650 n.4 (2001). "The interpretation of [a] release [is] a question of law." *Cole v. Ladbroke Racing Michigan, Inc.*, 241 Mich. App. 1, 13 (2000).

Michigan law expressly permits "a party to contract against liability or damages caused by its own ordinary negligence." *Skotak v. Vic Tanny Intern.*,

*Inc.*, 203 Mich. App. 616, 617-18 (1994).  Plaintiff does not dispute that he signed the Waiver and provides no factual support to avoid the consequences of the Waiver.  He does not argue, for example, that (1) he "was "dazed, in shock, or under the influence" when he signed the Waiver; (2) "the nature of the instrument was misrepresented, or (3) there was other fraudulent or overreaching conduct." *Xu v. Gay*, 257 Mich. App. 263, 273 (2003).[4]  Rather, Plaintiff asserts that "Red Frog fails to indemnify itself from its own negligent acts" because it "did not use the term 'negligent' and/or 'negligence' anywhere within the four corners of it's (sic) Waiver & Release Agreement."  (Plf's Resp., Dkt. # 8, at 6).  For this

---

[4] In response to Defendant's Motion, Plaintiff submitted various materials outside the pleadings, including an unsigned and different version of the Waiver, an affidavit from Plaintiff, affidavits from two participants, a press release from Defendant regarding the Warrior Dash, and an excerpt from the above quoted blog picturing participants' dives and requesting that readers vote for the best dive.  To the unsigned Waiver, the Court notes that while slightly different, the material language at issue is the same -- including that Plaintiff agreed to "not dive into or enter the mud pit head first," that the Warrior Dash is a "hazardous activity," that he "assum[ed] the full risk of any and all injuries," and that he agreed to release Defendant from "any and all" claims.  Plaintiff's affidavit also fails to raise any issues challenging the factual circumstances of his signing of the Waiver.  Finally, the remaining materials just supplement his Complaint assertions -- namely, that Defendant's agent encouraged participants to dive into the mud pit.  Such materials "simply fill[] in the contours and details of the [P]laintiff's complaint, and add[] nothing new."  *Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997).  In short, nothing in these materials provides the Court with any basis for finding that there would be any facts that could be developed through discovery that would provide a factual predicate to support Plaintiff's negligence cause of action.  Accordingly, the Court declines to consider these materials and therefore evaluates the sufficiency of Plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(6).

proposition, Plaintiff begins with a citation to an Eastern District of Michigan case, *Buffa v. General Motors Corporation*, 131 F. Supp. 478 (E.D. Mich. 1955), finding that "a contract of indemnity which purportedly indemnifies against the consequences of one's own negligence is subject to strict construction and will not be so construed unless it clearly appears from the language used that it was intended to have that effect." *Id.* at 482.

There is no doubt that Michigan courts have adopted this general proposition, but not in the manner in which Plaintiff suggests. *See, e.g., Skinner v. DM–E Corp.,* 124 Mich. App 580, 586 (1983) ("It is universally recognized that a contract which purports to confer an express right to indemnification against the consequences of one's own negligence is subject to strict construction and will not be so construed unless the contract language clearly evidences that such was the intended effect.").  Instead, Michigan courts hold that "indemnity clauses need not expressly mention the indemnitee's own acts to provide coverage for them." *Badiee v. Brighton Area Sch.,* 265 Mich. App. 343, 353 (2005) (*citing Sherman v. DeMaria Bldg. Co., Inc.*, 203 Mich. App. 593 (1994)).  As the *Sherman* court explained:

> Michigan courts have discarded the additional rule of construction that indemnity contracts will not be construed to provide indemnification for the indemnitee's own negligence unless such an intent is expressed clearly and unequivocally in the contract.  Instead, broad indemnity language may be interpreted to protect the indemnitee against its own negligence if this intent can be ascertained

9

> from "other language in the contract, surrounding circumstances, or from the purpose sought to be accomplished by the parties."

*Sherman*, 203 Mich. App. at 596-97 (citation omitted); *see also Chrysler Corp. v. Brencal Contractors, Inc.*, 146 Mich. App. 766, 771 (1985) ("Earlier cases imposed the additional rule of construction that indemnification contracts will not be construed to indemnify the indemnitee against losses from his own negligent acts unless such an intent is expressed in unequivocal terms.  That rule of construction no longer applies.") (internal citations omitted).   Put another way, "although an indemnity provision does not expressly state that the indemnitee will be shielded from its own negligence, such language is not mandatory to provide such indemnification."  *Fischbach-Natkin Co. v. Power Process Piping, Inc.*, 157 Mich. App. 448, 452-53 (1987); *Harbenski v. Upper Peninsula Power Co.*, 118 Mich. App. 440, 454 (1982) ("The contention that the intent to indemnify an indemnitee against his own negligence must be expressly stated has been rejected.") (citing *Vanden Bosch v. Consumers Power Co.*, 394 Mich. 428 (1975)).

Plaintiff contends that *Sherman* does not so hold, and rather only stands for the narrow proposition that "if there is no unequivocal language in the agreement indemnifying defendant for its own negligent acts then the indemnity language may be interpreted to protect the indemnitee against its own negligence if this intent can be ascertained from other language in the contract, surrounding circumstances, or from the purpose sought to be accomplished by the parties."

10

(Plf's Resp., Dkt. # 8, at 8) (citation and internal quotations omitted). For support, Plaintiff argues that the presence of an exclusionary clause in *Sherman* -- excluding indemnification for claims based on the defendant's sole negligence -- "evince[d the] . . . intent to indemnify [defendant] against losses from its own negligence but not from loses caused solely by [defendant]." (*Id.*) (quoting *Sherman*, 203 Mich. App. at 598-99).[5] Though the Waiver here contains no such clause, *Sherman* cannot be read as requiring such juxtaposing language to either read in or read out coverage for a party's own negligence. Instead, *Sherman* counsels that courts must examine, among other things, the contract's "other language" in the absence of an unequivocal statement regarding a party's own negligence.

Here, the Waiver's "other language" "clearly expresses [D]efendant's intention to disclaim liability for all negligence, including its own." *Skotak*, 203 Mich. App. at 619. Michigan law plainly holds that the phrases "'any' and 'all' and of the phrase 'any and all' . . . include[s] one's own negligence." *Paquin v. Harnischfeger Corp.*, 113 Mich. App. 43, 50 (1982). This is because "there cannot

---

[5] *Sherman* also notes that the waiver referenced the "owner's continuing operations, which indicated that the parties realized their employees would be on the job site at the same time . . . [t]hus, the possibility that an injury or damage could result from [the defendant]'s negligence was apparent at the time the parties entered the contract." *Sherman*, 203 Mich. App. at 599. The Court addresses this language below.

be any broader classification than the word 'all.'   In 'its ordinary and natural meaning, the word "all" leaves no room for exceptions.'"  *Id.* (citation omitted).

In personal injury cases interpreting language nearly identical to the Waiver's language, Michigan courts find that such phrases disclaim one's own negligence.   Take *Skotak* for example.   There, the Michigan Court of Appeals addressed the scope of a waiver in a matter alleging negligence -- failing to train staff to respond to a heart attack -- against a health club after a club member suffered a fatal heart attack while sitting in a steam room.  203 Mich. App. at 617. In construing the waiver to include the defendant's own negligence, the *Skotak* court noted that the waiver's "inclusive language, 'any and all claims, demands, damages, rights of action, or causes of action, . . . arising out of the Member's . . . use of the . . . facilities,' clearly expresses defendant's intention to disclaim liability for all negligence, including its own."  *Id.* at 619 (alterations in original). The *Skotak* court also emphasized the breadth of the word "all," rejecting the plaintiff's argument that it covered certain kinds of negligence (slip and fall injuries resulting from use of exercise equipment), but not others (like negligent training and supervision):

> We fail to see how such a line can be drawn.  We do not believe that the risk that medical assistance might not be available is somehow less foreseeable than the danger of a slip and fall injury.  In any event, there is no broader classification than the word "all."  In its ordinary and natural meaning, the word "all" leaves no room for exceptions. Therefore, assuming that defendant was negligent in failing

12

adequately to train and supervise its employees, any claim arising out of that negligence would be barred by the release clause the decedent signed.

*Id.* (internal citation omitted).

Other personal injury cases -- of which Defendant features prominently and Plaintiff avoids all together -- also interpret similar waiver language to include one's own negligence.[6]  *See Cole*, 241 Mich. App. at 14 (release covering "all risks of any injury that the undersigned may sustain while on the premises . . . clearly expressed defendant's intention to disclaim liability for all injuries, including those attributable to its own negligence"); *Gara v. Woodbridge Tavern*, 224 Mich. App.

---

[6] None of the cases cited by Plaintiff discuss this line of cases.  Instead, he relies upon older cases that do not hold that releases must include the magic words of "negligence" or "negligent acts" and do not substantively analyze whether "any" or "all" language covers negligence claims.  *See, e.g., Gen. Acc. Fire & Life Assur. Corp., Ltd. v. Finegan & Burgess, Inc.*, 351 F.2d 168 (6th Cir. 1965); *Tope v. Waterford Hills Racing Corp.*, 81 Mich. App. 591 (1978).  He also distinguishes this matter from a recent unpublished Sixth Circuit case, *Fish v. Home Depot USA, Inc.* 455 F. App'x 575 (6th Cir. 2012).  There, the Sixth Circuit found that a ladder rental contract favored indemnification for several reasons: (1) the waiver included a rental "as is" provision; (2) the waiver had an acknowledgment that the plaintiff inspected the ladder; (3) the plaintiff had rented other equipment from the defendant before; and (4) because the plaintiff was renting and not purchasing the ladder, he was "undoubtedly aware" that others had used the ladder before him, and was therefore aware that there was a possibility that "latent equipment problems can be caused by ordinary wear and tear."  *Id.* at 580.  Plaintiff distinguishes *Fish*, asserting that he did not agree to an "as is" provision," had not dealt with Red Frog or the Warrior Dash before, did not inspect the course beforehand, and was not aware that the course would "become dangerous though the 'wear and tear' of other participants."  (Plf's Resp., Dkt. # 8, at 10).  *Fish* is not binding authority, and even if it was, it is not applicable to the instant matter because it still does not address the core issue of whether the Waiver's "any" or "all" language covered Defendant's own negligent conduct.

63, 67 (1997) ("The language whereby the participant agreed to assume 'any risks inherent in any other activities connected with this event in which I may voluntarily participate' and to take responsibility for 'any and all injuries (including death) and accidents which may occur as a result of my participation in this event . . . ' clearly expressed defendants' intention to disclaim liability for all negligence, including their own.").

More recently, the Michigan Court of Appeals distinguished this line of cases in *Xu v. Gay.*  In that matter, a man using a treadmill at a fitness center fell, hit his head, and died.  257 Mich. App. at 265.  Distinguishing *Skotak* and *Cole*, the Michigan Court of Appeals rejected the notion that the parties intended to release the fitness center from liability stemming from its own negligence:

> We find that the language in the alleged release is unambiguous, and clearly states that defendant would not assume responsibility for "any injuries and/or sicknesses incurred to [sic] me or any accompanying minor person as a result of entering the premises and/or using any of the facilities."  However, this provision does not inform the reader that he is solely responsible for injuries incurred or that he waives defendant's liability by relinquishing his right to sue, nor does it contain the words "waiver," "disclaim," or similar language that would clearly indicate to the reader that by accepting its terms he is giving up the right to assert a negligence claim.

*Id.* at 275.

Here, as with *Skotak*, *Cole*, and *Gara*, the Waiver unambiguously covered Defendant's own negligence.  The Waiver warned Plaintiff that "enter[ing] Warrior Dash [was] a hazardous activity" and that it presented "extreme

14

obstacles."   Plaintiff agreed to "assume *all risks* associated with competing in Warrior Dash" and acknowledged that there was "an inherent risk of injury when choosing to participate in recreational activities and programs."   Most critically, Plaintiff "voluntarily assume[d] the full risk of *any and all* injuries, damages or loss, regardless of severity, that [he] . . . may sustain as a result of . . . participation [in the Warrior Dash]."   Likewise, he also agreed to "waive, release, absolve, indemnify, and agree to hold harmless . . . Red Frog Events, LLC . . . for *any claim* arising out of an injury to me and from *any and all claims* . . . [including] tort . . . arising out of or connected with [his] participation in Warrior Dash."[7]   The Waiver therefore unambiguously covered Defendant's own negligence.   Finally and unlike *Xu*, the Waiver, titled as a "Waiver and Release of Claims, Assumption of Risk and Warning of Risk," informed Plaintiff that he was relinquishing his right to sue Defendant for claims resulting from his participation in the Warrior Dash.

Notwithstanding this clear language, Plaintiff claims other language contained in the Waiver "gave James the false impression that Red Frog would not

---

[7] Plaintiff's argument that "[t]here was nothing in Red Frog's indemnity provision that warned participants that Red Frog's agents would be interfering with the actual race or to notify James that there was potential that the risks of the race would be or could be heightened by the presence of Red Frog's agents, or that injury could result from the negligence of Red Frog or its agents" misses the mark. (Plf's Resp., Dkt. # 8, at 9) (contrasting with *Sherman*, *see* footnote 5).   Whether the indemnity provision warned of certain negligent acts or not, just as in *Skotak*, *any claim* arising out of negligence is barred given the Waiver's express and unambiguous language.

be negligent in the operation and performance of this racing event." (Plf's Resp., Dkt. # 8, at 10). For support, Plaintiff points to the disclaimer portion of the Waiver stating that Red Frog: (1) "is committed to conducting its race and activities in a safe manner and holds the safety of participants in high regard;" and (2) "continually strives to reduce such risks and insists that all participants follow safety rules and instructions that are designed to protect the participants' safety." Plaintiff omits, however, the remainder of the disclaimer, which provides that "participants . . . registering for the race, programs, and activities must recognize that there is an inherent risk of injury when choosing to participate in recreational activities and programs."

This argument is without merit. In *Cole*, the Michigan Court of Appeals rejected a similar argument in a personal injury case arising out of an accident at a horse-racing facility. There, the plaintiff "acknowledge[d] that due to the unique combination of dangerous factors in the restricted area associated with the stabling, exercising and training of a large number of horses, and the presence of tradespeople, jockeys, owner and other personnel in the area, there are inherent dangers in the restricted area which [the defendant] cannot eliminate after exercising reasonable care." 241 Mich. App. at 14. In rejecting the argument that the "which [the defendant] cannot eliminate after exercising reasonable care" language limited the scope of the release (to not cover negligent acts), the court

16

reasoned that the language "specifically addressed the dangerous conditions and inherent dangers in the restricted area of the racetrack." *Id.* The "reasonable care" language was, therefore, "an unambiguous emphasis of the fact that being in the restricted area entails dangers that cannot be eliminated by exercising reasonable care." *Id.*

Just as in *Cole*, the Waiver's language here regarding Defendant's commitment to conducting the Warrior Dash in a safe manner and to reducing risks cannot be read to carve out Defendant's negligence from the Waiver's scope. The very next sentence expressly warns participants of the "inherent risk of injury when choosing to participate in recreational activities and programs." The disclaimer language, read in toto, and pursuant to *Cole*, serves only as "an unambiguous emphasis" that participating in the Warrior Dash carries a risk of injury. This is especially true when, as discussed above, read in conjunction with the fact that the Waiver releases liability with respect to "any and all injuries" sustained as a result of participation in the Warrior Dash. *Id.* at 14-15.

In the alternative, Plaintiff presents an interesting theory with respect to the Waiver's enforceability: Defendant's conduct -- the emcee's statements encouraging participants to dive head first into the mud pit -- "constituted a waiver and modification of the release of liability." (Plf's Resp., Dkt. # 8, at 14). In sum, Plaintiff argues, "[t]his conduct led James to believe a waiver had occurred and it

17

was okay and safe to dive into the mud pit.  Red Frog failed to correct the actions of participants who dove into the mud pit or further instruct through the speaker system that this type of behavior was not permitted."  (*Id.*)

To find an implied waiver, the conduct of the party against whom waiver is asserted must be inconsistent with strict compliance with the terms of the contract. *H J Tucker & Associates, Inc. v Allied Chucker & Eng'g Co.,* 234 Mich. App 550, 564-65 (1999).  Though Plaintiff does not articulate this theory as such, Plaintiff essentially argues a waiver by estoppel theory.  "[A] waiver by estoppel implied from conduct focuses not on the intent or purpose of the waiving party but on the effect of its conduct on the other party."  13 WILLISTON ON CONTRACTS § 39:29 (4th ed).  "To prove waiver by estoppel, a party need only show that it was misled to its prejudice by the conduct of the other party into the honest and reasonable belief that the latter was not insisting on, and was therefore giving up, some right." *Id.*

Plaintiff's argument, however, is untenable.  Even assuming that Michigan law permits parties to orally modify a waiver and release,[8] the most Plaintiff has alleged is that Defendant's actions modified the provision prohibiting Plaintiff from diving into the mud pit head first.  Defendant's actions cannot be interpreted, as pled by Plaintiff, as an agreement to modify the Waiver such that Plaintiff could

---

[8] Neither Plaintiff nor Defendant briefed this issue.  The Court also notes that the Waiver does not include an integration clause.

18

hold Defendant liable for negligence due to injuries arising out of his participation in the Warrior Dash.  Therefore, the Waiver bars Plaintiff's negligence claim.

**B.    Plaintiff's gross negligence (Count II) and willful and wanton misconduct (Count III) claims**[9]

### 1.    Plaintiff has stated a claim for gross negligence

Gross negligence is "conduct so reckless as to demonstrate a substantial lack of concern for whether injury results."  M.C.L. § 600.2945(d); *Xu*, 257 Mich. App. at 269.   "Evidence of ordinary negligence does not create a question of fact regarding gross negligence."  *Xu*, 257 Mich. App. at 271.   Taking Plaintiff's allegations as true, Plaintiff's gross negligence count states a claim for relief.  As Plaintiff emphasizes, Defendant not only made participants acknowledge that the Warrior Dash is a "hazardous" activity and that it presents "extreme obstacles," it expressly enumerated rules regarding how participants were to enter the mud pit without doing so for other obstacles.  Simply, Plaintiff has adequately alleged that Defendant was aware of the dangers presented by the obstacles throughout the Warrior Dash and especially those presented by diving headfirst into the mud pit.  Despite this awareness, it is plausible that the act of encouraging Plaintiff -- and other participants -- to dive into the mud pit head first was so reckless to demonstrate a substantial lack of concern for whether injury would result.  *Cf.*

---

[9] These claims are not within the Waiver's scope as "a party may not insulate himself against liability for gross negligence or wilful and wanton misconduct." *Lamp v. Reynolds*, 249 Mich. App. 591, 594 (2002).

*Kahn v. East Side Union High Sch. Dist.*, 31 Cal. 4th 990, 1012-13 (2003) (finding issue of fact regarding swimming coach's recklessness where a student broke her neck after diving into shallow water after the coach, among other things, allegedly "ignored her overwhelming fears and made a last-minute demand that she dive during competition, in breach of a previous promise that she would not be required to dive"); *Falgoust v. Richardson Indus., Inc.*, 552 So. 2d 1348 (La. Ct. App. 1989) (affirming apportionment of fault to pool owner who "not only failed to warn or reprimand plaintiff [for diving into a non-diving pool], but [who also] encouraged diving by doing it himself").

This is therefore distinguishable from the case relied upon by Defendant where the plaintiff just alleged that the defendant "acted in a grossly negligent manner." *See Thomas v. Rijos*, 780 F. Supp. 2d 376, 380 (D.V.I. 2011). Moreover, that "there are no specific allegations that [Defendant] knew when Plaintiff approached the mud pit that he would dive into it or that he would be injured," as Defendant asserts (Def's Br., Dkt. # 4, at 19), is irrelevant to the present inquiry. Defendant's knowledge of Plaintiff's intent before he dove into the mud pit is immaterial as to whether the act of encouraging Plaintiff to dive

head first demonstrated a substantial lack of concern for whether injury would result.[10]

In sum, Plaintiff has stated a claim for gross negligence.

### 2.     Plaintiff has stated a claim for willful and wanton misconduct

Willful and wanton misconduct is separate and distinct from gross negligence.  *Xu*, 257 Mich. App. at 269 n.3 (citing *Jennings v. Southwood*, 446 Mich. 125, 138 (1994)); *Burnett v. City of Adrian*, 414 Mich. 448, 462 (1982) (Moody, J., concurring) ("[W]ilful and wanton misconduct . . . [is] qualitatively different from and more blameworthy than ordinary, or even gross, negligence."). The elements of a willful and wanton misconduct claim are: "(1) knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another, (2) ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand, and (3) the omission to use such care and diligence to avert the threatened danger, when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another."  *Miller v. Inglis*, 223 Mich. App.

---

[10] Defendant urges this Court to "take into account the undisputed fact that Plaintiff expressly acknowledged the danger prior to encountering it when he signed the Waiver . . . and was specifically instructed not to 'dive or enter the mud pit head first.'"  (Def's Br., Dkt. # 4, at 19).  Such an argument has no bearing on whether Defendant demonstrated a substantial lack of concern for whether an injury results with respect to Plaintiff's claim that Defendant encouraged Plaintiff to dive head first into the mud pit.  This is not to say that Defendant's argument might not have some merit down the road as, for example, Michigan law requires the allocation of damages "in direct proportion to the person's percentage of fault."  M.C.L. § 600.2957(1).

159, 166 (1997) (citing *Jennings*, 446 Mich. at 137).  Michigan's Supreme Court

has clarified that "willful and wanton misconduct is made out only if the conduct

alleged shows an intent to harm or, if not that, such indifference to whether harm

will result as to be the equivalent of a willingness that it does.  Willful and wanton

misconduct is not . . . a high degree of carelessness." *Jennings*, 446 Mich. at 138

(1994) (emphasis omitted).  It is, therefore, "in the same class as intentional

wrongdoing." *Boumelhem v. Bic Corp.*, 211 Mich. App. 175, 185 (1995).

The seminal Michigan case on point with respect to willful and wanton

misconduct is *Burnett v. City of Adrian*.  In that case, the City of Adrian created

Lake Adrian to use as a reservoir for its water treatment facilities.  414 Mich. at

458.  According to the plaintiffs' complaint, a 14-year old boy drowned after

walking off the edge of a submerged structure that the City of Adrian failed to

destroy or level when it created the lake.  *Id.*  The boy drowned after being swept

away by "an unnatural current" created by the submerged structure.  *Id.*  Finally,

the complaint alleged that "that the city knew that the structure existed from maps

at the time of flooding and from the fact that the structure is visible when the water

level is low; that the city knew or had reason to know of the potential harm created

for swimmers, including children, who used the area; and that it failed to avert the

danger by destroying the structure, fencing the lake, or posting warnings." *Id.* at

458-59.  Taking these allegations as true, the Michigan Supreme Court found that

22

the plaintiffs "barely" asserted enough facts to make out the claim that the City of Adrian "was indifferent to the likelihood that catastrophe would come to a member of the public using the lake, an indifference essentially equivalent to a willingness that it occur." *Id.* at 456.

Applying this standard, it is plausible -- though barely -- that Defendant's actions amounted to willful and wanton misconduct. The Michigan Supreme Court has often noted that "[i]t is most difficult to determine, in a particular case, where negligence ends and wilful and wanton begins." *Id.* at 477 (Moody, J, concurring) (citing *Goss v. Overton*, 266 Mich. 62 (1934) and *Finkler v. Zimmer*, 258 Mich. 336 (1932)). "This caution is appropriate in the case at hand, because the [gross] negligence claim stands." *Bondie v. BIC Corp.*, 739 F. Supp. 346, 352 (E.D. Mich. 1990). Here, a reasonable jury *might* conclude that the act of encouraging participants to jump head first into the mud pit despite knowing the risks to the contrary -- at the end of a grueling physical endurance challenge when participants are likely to be physically and mentally exhausted -- could be interpreted as such "indifferen[ce] to the likelihood that catastrophe would come to a [race participant.]" *Burnett*, 414 Mich. at 456. The Court reaches this conclusion with some significant reservation as to whether discovery will produce such facts. However, giving Plaintiff the benefit of every doubt and knowing that he need only "nudge[ his] claims across the line from conceivable to plausible" in

23

order to survive a motion to dismiss under Rule 12(b)(6), *Twombly*, 550 U.S. at 570, it seems appropriate here to allow Plaintiff the opportunity to try to develop his case.   This is particularly so given that the facts set forth in *Burnett* also "barely" stated a claim and that Plaintiff's gross negligence claim also survives. Accordingly, Plaintiff has pled enough facts sufficient to plausibly state a claim for willful and wanton misconduct.

## IV. CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (Dkt. # 4) is partially granted.   Accordingly, the Court dismisses Plaintiff's Count I (negligence) with prejudice.

**IT IS SO ORDERED.**

Dated:   October 22, 2013             s/Gerald E. Rosen
                                      GERALD E. ROSEN
                                      CHIEF, U.S. DISTRICT COURT

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, October 22, 2013, by electronic and/or ordinary mail.

                                      s/Julie Owens
                                      Case Manager, 313-234-5135